# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ROBERT A. MARCHESE,

               Plaintiff,

v.

PRAPTI KUBER,

               Defendant.

Case No. 21-CV-1379-JPS

**ORDER**

## 1.     INTRODUCTION

Plaintiff Robert A. Marchese ("Plaintiff"), who is currently incarcerated at Racine Correctional Institution ("RCI"), filed a pro se complaint under 42 U.S.C. § 1983 alleging that Defendant Dr. Prapti Kuber ("Defendant" or "Dr. Kuber") violated his constitutional rights. ECF No. 1. On August 31, 2022, the Court screened the complaint and allowed Plaintiff to proceed against Defendant on an Eighth Amendment claim for deliberate indifference to his serious medical needs. ECF No. 4 at 4.

On June 30, 2023, Defendant filed a motion for summary judgment. ECF No. 11. Plaintiff did not file any opposition. Defendant filed a reply on August 30, 2023. ECF No. 17. To date, Plaintiff has filed no opposition to this motion for summary judgment, despite more than four months passing since its initial filing. As such, that motion is now fully briefed and ready for disposition. For the reasons explained below, the Court will grant Defendant's motion for summary judgment.

## 2.     LEGAL STANDARD – SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

### 3. FACTUAL BACKGROUND

In accordance with the Court's scheduling order, Defendant filed a joint statement of stipulated facts along with a separate statement of disputed facts. ECF No. 13. Plaintiff has failed to respond to Defendant's disputed facts and, as such, the Court will consider all of Defendant's facts as undisputed. *See* Fed. R. Civ. P. 56(e)(2). As such, the following facts are taken directly from Defendant's statement of fact with only minor changes for clarity. *See* ECF No. 13.

Plaintiff is an inmate in the custody the Wisconsin Department of Corrections, housed at RCI, where he was housed at the times relevant to his claims in this lawsuit. Defendant Dr. Kuber was employed by the Wisconsin Department of Corrections as a physician at RCI during the times relevant to the claims in this lawsuit.

On December 9, 2019, at Dodge Correctional Institution ("DCI"), APNP Nathan Tapio completed Plaintiff's intake examination. APNP

Tapio's medical note from that examination notes that Plaintiff's left lower extremity ("LLE") had onset medical issues after a motor vehicle accident in September 2017. The note stated that Plaintiff reported that he had a previous MRI of the lumbar spine with no specific findings. APNP Tapio noted that Plaintiff describes left lower extremity posterior thigh paresthesias intermittently with positioning. In layman terms, Plaintiff was describing numbness to the back side of his left thigh and lower leg that comes and goes with a change in position. Sometimes a nerve may be irritated from a muscle that may press depending on the position which irritates wherever the nerve travels, in his case down the leg. APNP Tapio prescribed Plaintiff Meloxicam, 7.5mg, twice a day for chronic back pain. Meloxicam is a nonsteroidal anti-inflammatory drug ("NSAID") used to relieve pain, tenderness, swelling, and stiffness.

On January 2, 2020, APNP Tapio saw Plaintiff for chronic left-sided lower extremity pain. APNP Tapio again noted that Plaintiff explained he was in a car accident in 2017. He also reported a previous lumbar spine MRI study was unrevealing and he was not able to obtain a lower extremity MRI before he was incarcerated. Plaintiff denied any specific weakness to his lower extremity. He reported symptoms primarily to the left-sided sacroiliac region radiating to the inguinal area as well as some pain to the outer part of the greater trochanteric bursitis ("GTB") or hip but Plaintiff denied any specific weakness. Plaintiff relayed that he informed APNP Tapio that he was scheduled for an MRI prior to being incarcerated, however, was unable to do this imaging due to his custody status. APNP Tapio's note states that Plaintiff reported that he tries to work out, but sit-ups are bothersome. He also reported difficulty sleeping on his back and certain sides as well as difficulty laying on his left side. Plaintiff

wanted further imaging of his left lower extremity. He continued to take hydroxyzine, trazodone, venlafaxine and per his history, anti-inflammatories have minimal effect. APNP Tapio ordered a left hip x-ray for further evaluation as well as an extra pillow for bedtime and Capsaicin, a topical cream used to relieve pain.

On January 10, 2020, Plaintiff had a bilateral hip x-ray. The findings indicated there was not acute fracture or dislocation, the osseous structures were intact, the joint spaces were preserved, and the soft tissues were unremarkable therefore there was no acute osseous abnormality. The results of the bilateral hip x-ray showed that there was nothing abnormal with Plaintiff's hip. The results show that, on both sides of his hips, the bones are in alignment – there are not fractures noted, new or old. APNP Tapio diagnosed Plaintiff with chronic lower back pain on January 2, 2020. On January 30, 2020, Plaintiff transferred to RCI.

From January 30, 2020 (when Plaintiff transferred to Racine) until March 2021, Dr. Kuber was Plaintiff's primary physician or provider. On January 30, 2020, the Racine Health Services Unit ("HSU") conducted a new inmate review of Plaintiff's medical records. The new intake review notes that Plaintiff arrived at Racine with prescriptions for Venlafaxine 75mg, Venlafaxine 150mg, Meloxicam 7.5mg, Trazodone 100mg, Hydroxyzine 10mg, and Capsaicin 0.025% topical cream. Venlafaxine is for psychiatric indications but also helps manage pain. There are combinations of anti-depressants that co-treat similar nerve pain pathways. Meloxicam is a long-acting anti-inflammatory like ibuprofen but lasts longer so that patient does not have to take it as often and relief is there for a longer period. It is prescription only. Capsaicin is a topical anesthetic cream to help with any surface/skin pain. Finally, trazodone is a sleep aid. The new intake

review also states that Plaintiff was placed in a queue to be scheduled for an appointment to discuss his chronic pain with a provider.

On February 13, 2020, an HSU nurse saw Plaintiff for left knee pain. The note states that Plaintiff was able to ambulate without difficulty with a steady gait. The nurse instructed Plaintiff to notify the HSU if his pain worsened or there was no improvement. The nurse also instructed Plaintiff to take pain medication as needed and not to overexert his knee. The note says nothing about Plaintiff complaining of back pain. Plaintiff noted that the pain stemmed from his lower back. On February 22, 2020, an HSU nurse saw Plaintiff for back pain. Plaintiff complained he had a low bunk at Dodge, but he was assigned a top bunk after he was released from the Restrictive Housing Unit ("RHU") and his leg and back hurt from climbing to the top bunk. The HSU nurse noted that Plaintiff walked in an upright position with a normal, steady gait. The nurse also noted that Plaintiff changed position with ease, got off and on the exam table without difficulty, was able to walk on the balls of his feet and heels without difficulty, and was able to lift both legs 45-degrees while laying on the exam table. The nurse noted that Plaintiff had a provider appointment "next month" for back pain. Although the note states as such, Plaintiff denied that his left leg lifts 45-degrees. At the February 22, 2020 appointment, the HSU nurse stated that she encouraged Plaintiff to stretch the lump on his back and use the Capsaicin cream and Meloxicam as directed. She additionally issued him Acetaminophen. Finally, the nurse noted that Plaintiff's low bunk restriction request was denied because he did not meet the criteria.

On February 27, 2020, an HSU nurse saw Plaintiff for low back and left leg pain. Plaintiff stated he has had low back and left leg pain for two years and that he was very upset and wanted to know who he should write

to so he could get an MRI. The nurse noted that Plaintiff had a provider appointment next month and she educated him to continue with his current care plan and to increase fluids and continue analgesics and stretches. Nurses in the HSU are not able to make appointments for an inmate patient to receive an MRI; an advanced care provider ("ACP") is the only person who can order an MRI. Furthermore, an ACP, such as a doctor, must see and examine the inmate patient prior to ordering an MRI. Dr. Kuber does not set her own schedule for when an inmate patient is scheduled to see her. The HSU nurses put inmate patients on Dr. Kuber's schedule for an appointment, and Dr. Kuber sees the inmate patients that are placed on her schedule. Inmate patients with emergency medical issues are prioritized for appointments with an ACP over inmates with non-emergency medical issues. Plaintiff notes that after each appointment, the nurse would state to him that they would send an email to his provider.

Plaintiff's ongoing back pain was not an emergency medical issue. The accident that caused his back pain occurred over two years prior, he was receiving ongoing pain management for his back pain, and there was nothing that indicated that his back pain was an emergency. Therefore, an HSU nurse would have placed him on Dr. Kuber's schedule to be seen as a routine medical visit. Any urgent/emergent always takes priorities over non-emergent medical issues. As an ACP during the COVID-19 pandemic, Dr. Kuber took all safety measures also into consideration. For Plaintiff, a patient who had been seen multiple times with no concern for severe pathology (meaning a non-emergent medical need), the prison staff would not bring him back and forth to the HSU risking him to exposure to COVID-19 and infecting his unit. This was occurring in the community as well. For

example, in hospitals, routine visits, normal follow up did not occur because the risk of infection and spreading was too high.

On March 8, 2020, an HSU nurse saw Plaintiff because he submitted a Health Service Request ("HSR") on March 7, complaining about chronic low back pain. Plaintiff also asked the nurse for a TENS Unit. The HSU nurse noted Plaintiff arrived at HSU with a slow, steady gait and was a new intake to Racine. She explained that physical therapy and a TENS Unit must be ordered by his provider. The HSU nurse also noted Plaintiff did not have an upcoming appointment and she would request a provider appointment to discuss his x-ray results and plan of care ("POC"). Dr. Kuber is unsure why, at the March 8, 2020 appointment, the HSU nurse noted that Plaintiff did not have an upcoming appointment with an ACP. Again, Dr. Kuber was not responsible for setting appointments for an inmate patient to see an ACP. On March 19, 2020, Dr. Kuber had Dr. Kuber's first appointment with Plaintiff. Plaintiff stated that he had been in a car accident two years before his incarceration. He was able to perform daily activities ("ADL") but his pain was an 8/10 that limited his lifestyle. Dr. Kuber had a lengthy discussion with Plaintiff about his chronic left sacroiliac joint pain diagnosis and reassured him that his pain could be managed but may never completely abate his symptoms all the time. At this time, Plaintiff was accepting of the discussion. Typically, if there was a conflict of understanding, Dr. Kuber would document patient did not agree but was explained. However, when patients understand, Dr. Kuber documents it appropriately. In Plaintiff's case, it is very important to keep realistic goals of treatment and the patient's understanding of the conditions. Dr. Kuber always explains that some things may not resolve – some pain a patient may live with and is normal. The patient's ability to

perform activities of daily living should not be impeded by the pain, and that was never the case with Plaintiff. Every note in his file shows that he was functioning, including that he was sitting and walking without assistance. Nothing that Dr. Kuber saw or reviewed made her believe that Plaintiff was not able to perform activities of daily living. Plaintiff notes that, although he was sitting and walking without assistance, he was doing so because he no other option such as a wheelchair.

Dr. Kuber ordered a lower bunk restriction, a TENS Unit, and a spine lumbosacral x-ray as well as Amitriptyline 25mg, Celecoxib 200mg, and Lidocaine topical cream. Dr. Kuber ordered a lower bunk restriction for Plaintiff to help reduce the pain that he had from climbing into a top bunk. Dr. Kuber wanted to help Plaintiff avoid having the possibility of putting excess stress on his joints from climbing into the top bunk. Dr. Kuber believed a TENS Unit was appropriate to help Plaintiff with his back pain because it can help reduce the pain signals and possibly help relieve his pain. Additionally, a TENS Unit is a common method to manage pain such as the pain that Plaintiff was experiencing. Plaintiff adds that the relief provided by the TENS Unit is a temporary relief from pain. A TENS Unit is a small, battery-operated device that has leads connected to sticky pads called electrodes. The pads are applied directly to the skin. When the machine is switched on, small electrical impulses that feels like a tingling sensation, are delivered to the affected area of your body. The electrical impulses can reduce the pain signals going to the spinal cord and brain, which may help relieve pain and relax muscles. They may also stimulate the production of endorphins, which are the body's natural painkillers.

A lumbosacral spine x-ray is a picture of the small bones (vertebrae) in the lower part of the spine. This area includes the lumbar region and the

sacrum, the area that connects the spine to the pelvis. Dr. Kuber ordered this x-ray to get a better look at Plaintiff's lower spine to help determine what was causing his back pain. Dr. Kuber ordered this x-ray to ensure there was nothing else that she was missing due to persistent complains. Dr. Kuber did not feel that it was appropriate to order Plaintiff an MRI at this time because his condition did not indicate that an MRI was appropriate. There was no indication of a dislocation of bones, no deformity of his back, and his symptoms of numbness were consistent with nerve irritation.

Based on Dr. Kuber's medical training and experience, Dr. Kuber did not believe that any of these signs or symptoms warranted an MRI. An MRI is usually ordered to see if there is a risk of paralysis or risk of losing function. Plaintiff never presented with any of those symptoms or conditions. Additionally, Dr. Kuber weighed the risk of sending Plaintiff for an MRI. MRI is not only excessive exposure of radiation but exposure to COVID-19 at the time. Dr. Kuber prescribed Plaintiff Amitriptyline 25mg, Celecoxib 200mg, and Lidocaine topical cream to help manage his back pain. Amitriptyline is a medicine used for treating pain, including nerve pain and back pain. Studies have shown that Amitriptyline may be an effective treatment for low back pian. Plaintiff notes that Amitriptyline is also an antidepressant. Celecoxib is a medication used to relieve pain, tenderness, swelling, and stiffness caused by ankylosing spondylitis (arthritis that mainly affects the spine), and also osteoarthritis (arthritis caused by a breakdown of the lining of the joints), and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints).Finally, Lidocaine topical cream is an anesthetic cream that can assist in helping reduce pain. Dr. Kuber believed that these medications would help provide pain relief

for Plaintiff. These medications are common for treating back pain such as the pain Plaintiff described.

At this time, COVID-19 was becoming an issue at RCI, and medical appointments were being affected by the pandemic. Inmates were at a very high risk of exposure due to close-quarters confined areas. If one person was infected, the whole unit would be quarantined, and mass tested. That would again stop the movement for anyone needing health assessments or treatment. It is not ideal for anyone to go out to a hospital unless there was a real emergency. Additionally, during COVID-19, hospitals were not accepting patients for chronic low back pain concerns because it was not an emergency that required potential exposure from a hospital visit. On April 20, 2020, a physical therapist saw Plaintiff for a Physical Therapy Evaluation and Treatment appointment so he could be assessed for a TENS Unit. On April 29, 2020, a nurse saw Plaintiff for left knee pain. Plaintiff did not complain about back pain. Plaintiff notes that the pain stemmed from his lower back and radiated down his left leg. Plaintiff received physical therapy on May 1, 5, 8, 13, and 19.

On May 7, 2020, Dr. Kuber saw Plaintiff for a follow-up appointment. Plaintiff reported persistent pain that was not improving with Elavil or Celebrex. He described the pain as shooting with no physical weakness. Plaintiff also stated he had been asking for relief since December but "nothing has been done." Plaintiff then became repetitive and derogatory, used profanity, and expressed unreasonable expectations. Plaintiff expected his pain to completely stop. As Dr. Kuber discussed with him previously, and he acknowledged, he may never be completely pain free, and his condition was a chronic condition. Rather, Dr. Kuber attempted to work with him to provide all available and realistic options to

control and relieve his pain. Dr. Kuber explained to Plaintiff that he could follow up with the physical therapy unit the following day regarding the TENS Unit. Since the TENS Unit order was placed through physical therapy, Dr. Kuber was not in control of when Plaintiff would receive it. If Plaintiff was having an issue with getting his TENS Unit, the physical therapy unit was the correct people for him to reach out to. Plaintiff demanded that Dr. Kuber schedule an MRI, but Dr. Kuber explained that the risks of contracting COVID-19 outweighed the benefit given that Plaintiff's symptoms did not suggested urgency. Plaintiff did not agree with Dr. Kuber and continued to be demanding. Plaintiff left the office and asked, "how can I put a complaint about you?" Plaintiff notes that what he said to Dr. Kuber was, "how do I file a complaint?" Plaintiff states that Dr. Kuber responded, "figure it out."

Based on medical training and judgment, Dr. Kuber believed that the risk of Plaintiff getting COVID-19 outweighed the potential benefit of Plaintiff getting an MRI at that time. In May 2020, COVID-19 was spreading quickly, especially in the prison population. The risks were still not fully known, and there was no vaccine. Sending Plaintiff off-site to get an MRI potentially could have exposed him (and the staff escorting him) to the virus. Additionally, Dr. Kuber was instructed to not send inmate patients off-site unless it was for emergency medical care. There was only minimal potential benefit from Plaintiff receiving an MRI at that time. Again, he was not having a medical emergency, and he was receiving treatment for his back pain. Receiving an MRI would not have relieved his back pain. Additionally, as described above, Plaintiff's condition did not indicate that he was a candidate for an MRI. The potential risks of sending Plaintiff for an MRI, including him being exposed to radiation and COVID-

19, greatly outweighed the very minimal benefit of him receiving an MRI. Plaintiff notes that he had an MRI scheduled, prior to his incarceration, and there was no concern to exposing him to radiation then. Dr. Kuber noted from the appointment there was no acute loss of vertebral body height of significance. The osseous structures appeared intact. Intervertebral disc spaces are narrowed. Soft tissues are unremarkable and mild facet hypertrophic changes. Based on Dr. Kuber's evaluation of Plaintiff and his medical records, Dr. Kuber determine that he suffered from chronic left sacroiliac joint pain. Plaintiff did not report cord compression symptoms and was able to perform ADL and walked independently without debility. Plaintiff notes that 75% of the time he stayed in his room due to his back pain. Dr. Kuber noted that she would follow-up with security for activity level/functioning.

Based on Plaintiff telling Dr. Kuber that he was receiving no relief from the current pain medications that he was taking, Dr. Kuber decided that it was appropriate to discontinue the pain medications that he stated were not working. Plaintiff notes that he was never informed that his medications would be stopped. Dr. Kuber chose to discontinue the pain medications that he stated were not providing him relief because pain medication comes with potential negative side effects, and if it is not working, Plaintiff should not take it in order to limit the potential harmful side effects. When a patient has tried all available pain medications, a provider will sometimes take the patient off the medications to allow his body to reset and reassess in its normal state of being. The medications can then be trialed again to see what may work. Additionally, Plaintiff was still receiving physical therapy and had a TENS Unit to continue to provide him with therapies to assist with his pain management. Dr. Kuber also noted

that she would forward her progress note from the May 7 appointment to physical therapy for review so that the physical therapy unit could determine what treatment they could offer. Finally, Dr. Kuber also forwarded the progress note to management for any assistance they can offer. Dr. Kuber forwarded the note to management to see if there were any other therapies that could be offered to Plaintiff. However, he had exhausted all available treatments.

Based on Dr. Kuber's examination and observations after the May 7, 2020 appointment, Plaintiff's care was appropriate with anti-inflammatories, TENS Unit, and nerve medications. Based on Dr. Kuber's follow-up with the security staff after the May 7, 2020 appointment, Dr. Kuber learned that Plaintiff was walking without difficulty. On his housing unit, security reported to Dr. Kuber that he was walking without difficulty and needed no help with his activities. After the May 7, 2020 appointment, Dr. Kuber reached out to the physical therapy department and learned that they felt that Plaintiff did not have any limitations that warranted more interventions than he had.

On May 8, 2020, an HSU nurse saw Plaintiff for back pain that radiated down his left leg. Plaintiff stated he saw his provider the day before and she stopped all his medication and left him with nothing. The HSU nurse noted that Plaintiff had no facial grimaces, was able to make his needs known and follow directions. Plaintiff also had a steady gait, clear speech, with no symptoms or signs of distress. There was no indication of swelling, redness, warmth, deformity, or bruising of his left leg. The HSU nurse noted that Plaintiff was working with the physical therapy unit and was seen prior to this sick call visit. The physical therapy unit had ordered a TENS Unit and Plaintiff was given Ibuprofen and

muscle rub. On May 25, 2020, Plaintiff had a lumbar spine x-ray. The findings indicated there was no acute loss of vertebral body and the osseous structures appeared intact and the soft tissues were unremarkable. The intervertebral disc spaces were narrowed. The results from the lumbar spine x-ray told Dr. Kuber that there were no major defects in Plaintiff's lumbar spine. Narrow disc space occurs with age and history of trauma which he had. Dr. Kuber placed the order to assess if there were any new injuries, and the results showed that there were no new injuries. Based on these results, there was no change to his plan of care.

On May 26, 2020, an HSU nurse saw Plaintiff for ongoing left leg pain. Plaintiff reported he had constant left leg pain which was exacerbated when he sat. Plaintiff also stated he had a history of left leg pain since a 2017 car accident. Plaintiff wanted further provider evaluation as well as pain medication, but he did not want Acetaminophen or Ibuprofen because both did not relieve his pain. The HSU nurse noted that Plaintiff walked to the exam area without any observed deficit but sat in the exam area on his right buttock with his left buttock elevated and left leg extended. The HSU nurse also noted Plaintiff had previous x- rays of his left knee and lumbar spine and was seen by a provider multiple times. The HSU nurse also noted that Elavil and Celebrex were ordered, but Plaintiff reported they were ineffective, so these medications were discontinued. Plaintiff was seeing a physical therapist and had a TENS Unit that provided pain relief. The HSU nurse placed a provider referral. After the HSU nurse placed a provider referral, the HSU staff would work to get Plaintiff scheduled. Dr. Kuber was not involved in scheduling inmate patients to see her. Also, at this time, COVID-19 was a major problem in the prison, and the HSU was prioritizing seeing patients with emergency medical needs. On June 12, 2020, an HSU

nurse saw Plaintiff for periods of severe back pain and left lower extremity pain that he described as a constant dull ache with intermittent sharp pain. The nurse noted that Plaintiff walked to HSU without assistance and his gait appeared normal. Plaintiff was issued a bottle of Acetaminophen 325mg, Ibuprofen 200mg, and Analgesic balm. Plaintiff was also told to refrain from contact sports, strenuous activity, and to continue daily strengthening and stretching exercises recommended by physical therapy.

On June 26, 2020, Dr. Kuber saw Plaintiff for complaints of acute pain. Plaintiff stated he was still experiencing persistent back pain and was having difficulty performing activities like walking and climbing stairs. Plaintiff also reported intermittent sharp, shooting pain. Plaintiff stated that Elavil offered some relief at a low dose, but he was willing to try Elavil (a brand name for amitriptyline) at a higher dose as well as Cymbalta (a brand name for duloxetine). Elavil (or amitriptyline) is an antidepressant medication that can be effective as an adjuvant treatment for chronic back pain, meaning that it is medication given along with pain medication. Cymbalta (or duloxetine) is a selective serotonin and norepinephrine reuptake inhibitor antidepressant ("SSNRI"). Cymbalta has been found to significantly improve pain for those suffering from musculoskeletal pain and chronic lower back pain. Dr. Kuber ordered 75mg of amitriptyline and 60mg of duloxetine for daily use for 350 days. Dr. Kuber believed that these medications at this higher dose may provide pain relief for Plaintiff's lower back pain. Dr. Kuber also ordered Ketorolac 60mg, an intermuscular injection used in the management and treatment of acute moderate to severe pain. Dr. Kuber believed that the Ketorolac may relieve Plaintiff's low back pain. Plaintiff notes that when he was given the Ketorolac that it helped with his pain, and he notified Dr. Kuber of that fact.

Finally, Dr. Kuber ordered a three-month chronic care pain follow-up appointment. Placing an order for a three-month follow-up would allow adequate time to allow the new medication regimen to take effect and to check if it was working to relieve Plaintiff's low back pain. Dr. Kuber is unsure why a three-month chronic care pain follow-up did not occur. After Dr. Kuber put in an order for a follow-up, Dr. Kuber does not schedule the follow-up. Other HSU staff scheduled appointments, and during this time (COVID-19), routine follow-up appointments were often not scheduled due to limited inmate movement to prevent the spread of COVID-19 and limited staff available at the institution.

Plaintiff notes that Dr. Kuber did not see him from June 2020 to January 2021. Plaintiff stated he was reassured and agreed with the treatment plan. On September 18, 2020, an HSU nurse saw Plaintiff for right foot pain. The nurse's note does not state that Plaintiff complained of back pain. On September 26, 2020, an HSU nurse saw Plaintiff for back pain. Plaintiff complained of continuous lower left back pain. Plaintiff stated it felt like something was pressing down on his back. Plaintiff also stated he had pain when sitting, bending, and turning and some limitations to activity/ambulation. The nurse noted that Plaintiff's gait was slow, and he moved slow to a standing position but was able to bear weight. Plaintiff complained that his back pain was an on-going issue and that he was doing everything he is supposed to do but the pain was not going away. The nurse offered Plaintiff Ibuprofen and Tylenol, but Plaintiff stated he already had Tylenol, Ibuprofen, and muscle rub in his room, and none of it had helped his pain. Plaintiff was given an ice bag and an extra towel for a warm compress to alternate with the ice bag and instructed to continue to take medications as ordered.

On November 2, 2020, Plaintiff submitted an HSR stating "The pain in my lower left back is getting more severe causing pain down my leg and interfering with my sleep, even on my stomach. I'm in pain. In order to sit in a chair, I have to roll up a towel and put in my lower back area to ease the pain. I understand due to the outbreak there isn't much that can be done but this Amitriptyline and Duloxetine is not working." On November 3, 2020, an HSU nurse saw Plaintiff for ankle pain. The nurse's note does not state that Plaintiff complained about back pain. On December 6, 2020, Plaintiff submitted an HSR stating: "I have filled out multiple HSU forms for my foot and back. Its [sic] been about 3 months since I injured my right ankle and its [sic] only getting worse. I've explained that its [sic] causing me pain and disturbing my sleep and I still have yet to be seen. It seems like I am just having paper wars back and forth. The point of filling out this form is to be seen. Yet the last on[e] I sent I was told to fill out another one. I am suffering and getting no where [sic]. Thank you for your time and understanding." The HSU Manager responded, "Next week appt."

On December 8, 2020, an HSU nurse saw Plaintiff per his HSR complaint of chronic pain. Plaintiff denied difficulties, at this time, and was made aware of an upcoming appointment with an ACP for the chronic care clinic. Plaintiff was encouraged to continue medications as directed. Plaintiff notes that this conversation occurred on December 7, 2020, while Plaintiff was in segregation. On December 29, 2020, Dr. Kuber received a general message from an HSU nurse that she should add Plaintiff to her schedule as soon as possible because he was experiencing chronic pain and nursing could not do anything more for him. Plaintiff notes that he was told in response to his December 6 HSR that he was scheduled for an appointment the next week. However, he was not seen the following week,

and only on December 29, 2020, was Dr. Kuber informed that he wanted to be seen. Dr. Kuber responded the same day that Plaintiff had been added to next week's schedule. Dr. Kuber does not set her own schedule, but Dr. Kuber could request her staff to prioritize a patient if his situation was brought to her attention. Dr. Kuber felt that it was appropriate to request that the staff add Plaintiff to her schedule because he continued to complain about his back, and Dr. Kuber wanted to make sure nothing had changed with his condition. Plaintiff notes that it had been almost six months since he last saw Dr. Kuber.

On January 11, 2021, Dr. Kuber ordered a Physical Therapy Evaluation and Treatment appointment because Plaintiff requested a lower bunk restriction. Dr. Kuber wanted a physical therapist to evaluate Plaintiff's functionality to determine his capacity. On January 29, 2021, Dr. Kuber saw Plaintiff for a follow-up appointment. Plaintiff reported he twisted his foot in July 2020 and was experiencing some aches and pains when he walked but there was no numbness or tingling. Plaintiff also reported that his sacroiliitis may have gotten worse because he gained weight while in RHU. Sacroiliitis is an inflammation of the sacroiliac joint ("SI"), usually resulting in pain that is often a diagnosis of exclusion. The sacroiliac joint is one of the largest joints in the body and is a common source of the buttock and lower back pain. It connects the bones of the ilium to the sacrum. Plaintiff and Dr. Kuber discussed that weight loss and lifestyle changes would improve sacroiliitis. Dr. Kuber ordered Naproxen 500mg for 90 days for pain. Dr. Kuber also ordered a right foot x-ray. Plaintiff notes that at this time he weighed 265 pounds. Since then, he has lost weight and now weight 209 pounds. His pain still remains. Naproxen is a NSAID that works on reducing pain by reducing

inflammation and pain in the body. Dr. Kuber believed that naproxen was an appropriate pain medication because some people have a better response to naproxen as opposed to ibuprofen. Anti-inflammatories work to resolve muscle inflammation that would then resolve nerve irritation. The January 29, 2021, appointment was the last time that Dr. Kuber saw Plaintiff. After that time, Dr. Kuber was no longer acting as his primary medical provider at the prison.

## 4.    ANALYSIS

Defendant's motion for summary judgment seeks dismissal of the Eighth Amendment deliberate inference to a serious medical need claim because the record is devoid of evidence to support a deliberate indifference claim. ECF No. 12. Despite Plaintiff's failure to oppose summary judgment and Defendant's disputed facts, the Court has independently reviewed the motion to determine whether it states adequate grounds for the relief requested. *See Nabozny v. Podlesny*, 92 F.3d 446, 457 n.9 (7th Cir. 1996) ("[T]he Seventh Circuit . . . requires that before granting a dispositive motion as unopposed, the trial judge must look at the motion to determine whether it states adequate grounds for the relief requested."). Based on the Court's review of Defendant's submissions, and for the reasons explained below, the Court will grant Defendant's motion for summary judgment.

### 4.1    Eighth Amendment Standard

Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 105. To prove that Defendant violated his rights under the Eighth Amendment, Plaintiff must present evidence establishing that he suffered from "'an objectively serious medical condition'" and that Defendant was "'deliberately, that is subjectively, indifferent'" to that condition. *Whiting v.*

*Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). A prison official shows deliberate indifference when she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

"'A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). A broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. *Id.* at 861 (citing *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (collecting cases)). On the other hand, a prison medical staff "that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (1997) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

Under the Eighth Amendment, an incarcerated person does not have the right to direct his own course of treatment. *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). Likewise, an incarcerated person's disagreement "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Johnson v. Doughty*, 433 F.3d

1001, 1013 (7th Cir. 2006)). But neither may prison officials "doggedly persist[ ] in a course of treatment known to be ineffective." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). To defeat Defendant's motion for summary judgment, Plaintiff must present evidence showing the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Id.* at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Finally, "[a] delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). The length of delay that is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'" *Id.* (quoting *McGowan*, 612 F.3d at 640). To prevail on an Eighth Amendment claim alleging a delay in providing treatment, the plaintiff "must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties v. Carter*, 836 F.3d 722, 730–31 (7th Cir. 2016). Such evidence may include a showing in the plaintiff's medical records that "the patient repeatedly complained of enduring pain with no modifications in care." *Id.* at 731; *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

### 4.2    Eight Amendment – Analysis

First, Defendant does not argue that Plaintiff did not have an objectively serious medical need. As such, for the purposes of this Order the Court will assume, without definitively ruling, that Plaintiff suffered from an objectively serious medical condition and satisfies the first prong of the deliberate indifference standard.

Second, assuming Plaintiff suffered a serious medical condition, the Court finds that no reasonable juror could find Defendant was deliberately indifferent to Plaintiff's need for treatment. Based on the allegations in Plaintiff's complaint, he believes Defendant improperly treated him and failed to provide him with an MRI or certain treatment for his back pain. Plaintiff's subjective belief of what was or was not proper medical treatment, however, is insufficient to survive summary judgment. Plaintiff's failure to respond to Defendant's motion for summary judgment is detrimental to opposing summary judgment. However, even assuming Plaintiff had responded and disputed many of Defendant's facts, the undisputed medical records in this case would almost certainly have won the day regardless. "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood,* 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County,* 163 F.3d 982, 988 (7th Cir. 1998)). Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation. *Johnson,* 433 F.3d at 1013. Federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011); *Sain,* 512 F.3d at 895.

Here, the undisputed facts show that Defendant saw Plaintiff a number of times and that she attempted to address Plaintiff's medical needs. At their first visit, on March 19, 2020, Defendant counseled Plaintiff

that although his pain could be managed it would never completely be gone. She noted that he was able to perform activities of daily living, such as sitting and walking without assistance. She then prescribed numerous treatments to alleviate his back pain (a TENS unit, three pain medications, a low bunk), and she ordered an x-ray of his lumbosacral spine. Plaintiff also received numerous physical therapy sessions following this visit. Defendant again saw Plaintiff on May 7, 2020, on May 25, 2020, and on January 21, 2021. The Court will not reiterate all the facts outlined above in relation to these visits, however, the undisputed facts show that Defendant was responsive to Plaintiff's complaints of pain. Defendant gave referrals for an x-ray, physical therapy, and chronic care pain follow-up; ordered a bottom bunk restriction; and prescribed oral and injectable medication.

Plaintiff has offered no evidence calling into question Defendant's exercise of professional judgment in treating Plaintiff. Plaintiff may have disagreed with Defendant's course of treatment, but Plaintiff's subjective believe is insufficient to prove deliberate indifference. *Johnson,* 433 F.3d at 1013. Deliberate indifference requires "[s]omething more than negligence or even malpractice." *Pyles*, 771 F.3d at 409. Courts defer to a medical professional's treatment decision unless no minimally competent professional would have chosen the same course of treatment under the circumstances. *Id.* Plaintiff has provided no evidence that Defendant's treatment of his condition was even negligent, or much less rose to the level of deliberate indifference. To the extent that Plaintiff claims a delay in his treatment shows deliberate indifference, Plaintiff has provided no independent evidence that any delay exacerbated his injury or unnecessarily prolonged pain. *See Petties,* 836 F.3d at 730–31. As such, the Court finds that no reasonable juror could find Defendant acted with

deliberate indifference to Plaintiff's medical needs. The Court will therefore grant Defendant's motion for summary judgment in its entirety and will dismiss this case.

5.      **CONCLUSION**

For the reasons explained above, the Court will grant Defendant's motion for summary judgment in full and will dismiss this case with prejudice.

Accordingly,

**IT IS ORDERED** that Defendant's unopposed motion for summary judgment, ECF No. 11, be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 20th day of November, 2023.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.